## CHARLES PLACE, JR., v. THE UNION EXPRESS COMPANY.

Express companies who receive and agree to transport goods or packages from place to place for hire, in the ordinary and approved means of conveyance, are common carriers, although they are not owners of, nor interested in, the conveyances by which the goods are transported,—disapproving *Hersfield* v. *Adams*, 19 Barb. 577.

A forwarder is one who, for a compensation, takes charge of goods entrusted or directed to him, and forwards them; that is, puts them on the way to their place of destination by the ordinary and usual means of conveyance, or according to the instructions he receives. His compensation is limited to his care and trouble, and the charges paid by him in receiving, keeping, and duly forwarding; and, when he has placed the goods in the course of transit by the proper conveyance, his duty is at an end. He has no interest in, and receives no part of the compensation paid for the carriage and due delivery of the goods.

A common carrier is one who, for a reward, undertakes to carry goods for persons generally, as a public employment. It is the receipt of, or the right to, the freight or charge for the carriage of goods, together with the public nature of their employment, that constitutes them common carriers.

The U. Express Co. received certain boxes of fruit, which they agreed, by a receipt in writing, to deliver at the depot at M. within twelve days, on payment of freight, stipulating against accidents and casualties beyond their control, and particularly that their guaranty of special dispatch should not cover cases of unavoidable or extraordinary casualty. They also stipulated that fruit should be at the owner's risk of transportation, loading, and unloading; that they would not be liable for injury to any articles of freight, during the course of transportation, occasioned by the weather, or accidental delays, or natural tendency to decay; that they would pay five cents per 100 pounds for each day the goods were delayed beyond contract time, and that all claims for damages, &c., should be presented for settlement at their office in New York. They shipped the fruit so received to M., the place of its destination, *via* the N. Y. C. RR. and the G. W. RR., with which roads alone they had any arrangements for transportation. For nearly two months prior to their taking the fruit in question, the G. W. RR. Co. had been unable to receive freight as fast as the N. Y. C. RR. delivered it, and, in consequence, there was a great accumulation of it, and a delay of at least ten days, on the average, in the transportation. The fruit in question was, in consequence, delayed over twenty days upon the route, and was nearly ruined by decay when it reached M. There was another road by which the fruit might have been sent, but the U. Express Co. had no arrangements for transportation with that road. In an action against the U. Express Co. to recover damages for the injury to the fruit, *held,*—

I. That the defendants' agreement to deliver the freight received, according to the

conditions of their tariff, classification, and rules, rendered them liable as common carriers for the safe carriage and delivery of the goods, and subjected them to the liability incident to that employment, except so far as it was limited by express stipulation.

II. That proof by the consignee that he did not receive the goods within the time specified, coupled with evidence that a part of them did not arrive, was sufficient evidence of the failure of the defendants to deliver at the depot at M., to throw on them the *onus* of showing when the fruit did arrive at the depot. It was a matter peculiarly within their knowledge, and slight evidence on the part of the plaintiff was therefore sufficient to throw on them the burden of proof.

III. That the defendants were liable for the decay of the fruit. The clause providing that they should not be liable for natural decay, must be understood as applying to decay to which the fruit might be subject during the prescribed time within which the defendants undertook to deliver it at M., not to such as was occasioned by the defendants' delay.

IV. That the clause providing that the defendants should pay five cents per 100 pounds for every day the goods were delayed beyond the time fixed by the contract for delivery, did not limit the liability of the defendants thereto. They were liable in that amount whether the plaintiff suffered any loss by the delay or not, and were also liable for any actual damage to the fruit occasioned by such delay. That clause in the agreement applied only to cases where the property was delivered uninjured, but after the contract time.

V. That it was not necessary for the plaintiff, as a condition precedent to the defendants' liability, to present the claim for settlement to them, at their office in New York. In order to avail themselves of any defence arising under the clause of the contract providing for such demand, it was necessary for them to plead a readiness to pay the amount of damages at such place, and follow it up by a tender of the amount in court.

VI. That the facts shown as being the cause of the delay did not prove that it was the result of an accident or casualty beyond the defendants' control. It was their duty to have known the conditions and possibilities of transportation upon the routes over which they were accustomed to transport their goods, before entering into a contract to deliver within a specified number of days; especially so when the cause of the detention was a disarrangement and want of facilities upon one of the roads not of a sudden development, or of a temporary duration, but one that had existed for some time prior to their making the contract.

Where there is a special contract to carry within a *prescribed* time, the carrier is held to a rigid performance of it, and is not excused even by inevitable necessity, unless he has provided against it by positive stipulation.

APPEAL by defendants from a judgment of the Marine Court at general term. The action was brought to recover damages for the

non-delivery of fifty boxes of fruit entrusted to the defendants at the city of New York, to be transported to Milwaukee.. Fifty boxes were delivered to the defendants for transportation on the 9th of April, 1856, and the other hundred boxes were delivered to them on the 26th of April, 1856. By the receipts, given by the defendants at the time, they contracted to transport the fruit and deliver it *at the depot of the railroad in Milwaukee* within twelve days from the date of the receipts respectively, Sundays,. accidents, and casualties beyond their control excepted; or pay five cents per 100 lbs. per day for each day the goods were delayed beyond contract time; all claims for damages to be presented at the New York office for settlement. The receipts further provided that the defendants would not be liable for injury to any articles of freight during the course of transportation occasioned by the weather, or accidental delays, or natural tendency to decay; nor would their guaranty of special dispatch cover cases of unavoidable or extraordinary casualty; nor would they hold themselves liable, as forwarders, for such articles after their arrival at the place of their destination; and that certain articles specified, including fruit, would only be taken at the owner's risk of fracture or injury during the course of transportation, loading, and unloading, unless specially agreed to the contrary.

The goods were not delivered within the prescribed time. Six boxes of the first fifty were never delivered. The remaining forty four boxes were not received by the consignee until the 8th and 9th of May—twenty-nine days from their receipt by the company. The fruit was then decayed, and nearly ruined. The second lot arrived on the 17th and 21st of May, from twenty-one to twenty-five days after their receipt, and was also badly spoiled. The facts constituting the cause of the detention are fully stated in the opinion of the court. Judgment was rendered for the plaintiff for $475.00 damages, being the loss in the value of the fruit, and the five cents per day per 100 pounds named in the contract. This judgment was affirmed at the general term of the Marine Court, and the defendants appealed.

*Luther R. Marsh,* for the appellants.

I. The rights of the parties are to be adjudged *according to the written contracts.* The defendants had a right to enter into them, and to define or restrict their liability.

Common carriers, even, may do this. *The Mer. Mut. Ins. Co. v. Chase,* 1 E. D. Smith's Rep. 115; *Davidson* v. *Graham—Ohio case,* Am. Law Reg., vol. 3, No. 5, p. 291; *Dorr* v. *N. J. S. Navigation Co.,* 1 Kernan R. 485. But expressmen or forwarders, like these defendants, are not within such restrictions as yet exist against common carriers. 12 J. R. 232; *Hersfield* v. *Adams,* 19 Barb. R. 577. It was admitted, in this case, that the defendants do not own, and are not interested in, the lines or routes by which the freight they carry is transported, nor in the vehicles by which the same is carried.

II. The defendants, according to their contract, are not liable at all to the plaintiff. 1. The contract is "*to deliver at the depot of the R.R. in Milwaukee.*" No breach of this contract is shown. The plaintiff has not shown that the goods did not all arrive *at the depot* within the contract time. The consignee is the only one who testified on this subject, and he only speaks of the time he received the fruit, or of the time it *arrived at his store or possession.* He does not show that he called for it at the depot—the place of delivery—at the expiration of the contract time, or at any time after, till the time he received it. "There must be some evidence" (even against a common carrier) "of the non-delivery according to the requirements of the bill of lading." 1 Car. & P. 110; 11 E Com. Law. R. 333; 5 Adol. & Ell. 543; 2 Greenleaf's Ev., p. 213; Angell on Carriers, 470. 2. The defendants are not liable for any injury *by decay of the fruit.* The contract expressly makes the conditions and the rules appended to it a part thereof. The 3d rule and condition is, that the company will not hold itself liable *at all* for injury to any article of freight, during the course of transportation, occasioned by *natural tendency to decay.* And the 4th rule and condition is, that "*fruit,*" among certain other enumerated articles, "will only be taken at the owner's risk of injury during the course of transportation, loading and

unloading, unless specially agreed to the contrary." Either of these conditions exempts the defendants from all liability for the *decay*. 3. The only liability there can be of the defendants is for the *delay*, if any, over the contract time, at the stipulated price of five cents per 100 pounds per day. As to this, we say : *a.* No delay is proved, as we have shown under the first subdivision of this point. It does not appear but that they arrived at the point of destination, the depot, in due time. *b.* If there was any delay, it was occasioned by causes not within the defendants' control, and comes within the meaning of the 3d condition and rule. By that the defendants stipulate that they shall not be liable "at all for any injury to any articles of freight, during the course of transportation, occasioned *by accidental delay.*" 4. It is stipulated that "all claims for damages shall be made at the New York office only." This is, by the contract, a condition precedent to any liability of the defendants. Such is the agreement. There is no proof whatever that any such claim was made at the New York office. No proof but what it would have been paid if it had been presented there. The defendants had a right to protect themselves against ruinous litigation by the stipulation that if the party had any claims for damage, he should first present the same to them, at headquarters, so that they could investigate, and, if liable, pay without the expenses of suit. This is twice stipulated for, showing unusual stress upon it.

*Stillwell & Swain,* for the respondents.

I. The defendants are common carriers, and, as such, are liable for the damage in question, notwithstanding the restrictions printed on the back of the bills of lading. 1. They describe themselves as the Union Express Company, between New York and Milwaukee, and contract to transport merchandise between these two points at fixed rates of freight. This constitutes them common carriers, whether they are interested in the vehicles in which the goods are transported or not. *Wilcox* v. *Parmlee,* 3 Sand. R. 610 ; *Fairchild* v. *Slocumb,* 19 Wend. 329. 2. As common carriers, they could not limit their common law liability, except by

special contract. Before a shipper can be bound by any notice printed on the bill of lading, it must appear that his attention was called to the restriction, and that he assented to it. *Dorr* v. *N. J. S. Nav. Co.*, 1 Kernan, 486, and cases cited. 3. A party who delivers perishable goods to a carrier, and stipulates for their delivery within a given time, is not *to be presumed* to have assented to a condition that the carrier should not be liable for neglect to deliver the goods until they were lost by decay.

II. Whether the defendants are common carriers or forwarders, they are liable for a breach of their special contract to deliver these goods at Milwaukee in twelve days. 1. The plaintiff proved by the consignee that he did not receive the goods until thirty days after they left New York. The agent does not pretend that they arrived sooner, but accounts for the delay. If the goods arrived sooner, the defendants should have notified the consignee thereof. Goods must either be delivered to the consignee personally, or he must be notified of their arrival.[1] *Fisk* v. *Newton*, 1 Denio, 45; *Gibson* v. *Culver*, 17 Wend. 305; *Price* v. *Powell*, 3 Comst. 322. 2. The delay was clearly negligent. 3. Even an express assent by the shipper to the restrictions endorsed on the bills of lading, would not relieve the defendants from liability for their tortious or grossly negligent acts. 4. The conditions *printed* on the back of the bills of lading, by which the defendants restrict their liability for decay during the course of transportation, must be considered as qualified by the *written* contract to deliver them in twelve days.

III. The defendants are liable for all the damages occasioned by the delay, and are not restricted to the five cents for each 100 pounds per day. The stipulation to pay five cents for each 100 pounds per day, for delay beyond the stipulated time, was intended as compensation for the delay in the delivery of the goods only, and not for any damage to the goods themselves occasioned thereby, and the plaintiff is entitled to recover this, in addition to his other damage.

[1] See *Rowland* v. *Miln, post.*

Place v. Union Express Co.

IV. The bringing of the suit against the defendants at New York, is a sufficient presentment at the New York office of the claim for damage. If the defendants were ready, before suit brought, to pay the claim upon presentation at the New York office, they should have pleaded that fact, and followed it up by a tender in court.

By the Court, DALY, First Judge.—The defendants claim to be exempt from liability upon the ground that, as expressmen, they are merely forwarders, and not common carriers; and we are referred to the case of *Hersfield* v. *Adams* (19 Barb. 577), as authority for the proposition that express companies, who agree to transport goods or packages from place to place, for hire, in the ordinary and approved means of conveyance, who are not owners of, nor interested in, the vessels, boats, or other conveyances by which the goods are transported, are not common carriers, but mere forwarders, subject to no greater liability than ordinary bailees for hire. The case is a special term decision, ion given by the late Justice Morris, and this point was not essential to its determination, as the defendants had limited their liability by a written contract, which they might do as common carriers. *Dorr* v. *N. J. S. Nav. Co.*, 1 Kernan, 485. No authority was cited for the opinion expressed, which proceeded, in my judgment, from the want of a due consideration of what is sufficient in law to constitute a common carrier. It is a calling very distinct from that of a forwarder. A forwarder is one who, for a compensation, takes charge of goods entrusted or directed to him, and forwards them, that is, puts them on their way to their place of destination by the ordinary and usual means of conveyance, or according to the instruction he receives. *Platt* v. *Hibbard*, 7 Cow. 499 ; *Ackley* v. *Kellogg*, 8 Cow. 223 ; *Brown* v. *Denison*, 2 Wend. 593. Where he has a warehouse for the reception and safe keeping of the goods until they can be forwarded, he unites the two-fold occupation of warehouseman and forwarder, which is the usual mode of conducting the business in this country. His compensation is limited to his care and

trouble, and the charges paid by him, in receiving, keeping and duly forwarding; and, when he has placed the goods in the course of transit by the proper conveyance, his duty is at an end. His occupation is further distinguished from that of the carrier by the circumstance that he has no interest in, and receives no part of, the compensation that is paid for the carriage and due delivery of the goods. A common carrier is one who, for a reward, undertakes to carry goods for persons generally as a public employment, or, in the language of Mr. Justice Story, "one who holds himself out as ready to engage in the transportation of goods for hire as a business, and not as a casual occupation *pro hac vice.*" Story on Bailment, § 495. An express company, therefore, who hold out to the public that they will take goods or parcels to be delivered at certain points or places, and who receive, or are to receive, the compensation that is paid for the carriage and delivery, are common carriers, and it is wholly immaterial whether they own or are interested, or not, in the conveyances by which the goods are transported, as it is the receipt, or the right to, the freight or charge for the carriage, together with the public nature of their employment, that makes them common carriers. The defendants in this case acknowledge, in writing, that they had received certain packages, which, by the writing, they agreed "to deliver at the depot at Milwaukee on the payment of freight according to the conditions of the company's tariff, classification and rules," which were endorsed upon the receipt, and made a part of it. This was engaging, as common carriers, to deliver the goods at the depot at Milwaukee, and subjected them to all the obligations incident to that employment, except so far as they had limited their liability by express stipulation.

By their contract they agreed to deliver each package receipted for, in twelve days after the date of the receipt, stipulating against accidents and casualties beyond their control, and particularly that their "guaranty of special despatch" should not "cover cases of unavoidable or extraordinary casualty." They also provided that "fruit" (which the packages contained) should be "at

Place v. Union Express Co.

the owner's risk of fracture or injury during the course of transportation, loading, and unloading." That they would not be liable for injury to any articles of freight during the course of transportation, occasioned by the weather, or accidental delays, or natural tendency to decay. That they would pay five cents per 100 pounds per day for each day the goods were delayed beyond contract time, if not delivered as per agreement; and that all claims for damages, overcharges, or any other cause, should be made, and presented for settlement at their office in New York. These stipulations and limitations of liability they had a right to make, and the rights of the parties are to be adjusted in accordance with them.

The witness Douglass swears that the 100 boxes of oranges receipted for by the defendants on the 26th of April, 1856, *arrived* on the 17th and 21st of May, 1856. Of the lot of fifty boxes receipted for by the defendants on the 9th of April, 1856, forty-four boxes were received by the consignees on the 8th and 9th of May, 1856. The six remaining boxes have not been accounted for.

The precise time of the arrival of the 100 boxes has been proved; but, in respect to the forty-four boxes, it is urged that proof of the time of their receipt by the consignees is not proof of the time of their arrival; and that, for all that has been shown upon the part of the plaintiff, they may have arrived within the contract time. As this action is for damages occasioned by the neglect or failure of the defendants to transport and deliver the property within the prescribed time, it is of course incumbent upon the plaintiff to show a breach of the contract. The goods were to be delivered at the depot at Milwaukee, and, as a general rule, where freight is to be delivered at a wharf, depot, or designated place, and the consignee is not there to receive it, it is the duty of the carrier to notify the consignee of its arrival. *Gibson* v. *Culver*, 17 Wend. 305; *Fisk* v. *Newton*, 1 Denio, 45; *Price* v. *Powell*, 3 Comst. 322; Angell on Carriers, §§ 315, 316. In this case, the consignees at Milwaukee were denoted upon the bill of lading simply by initials. This may give rise to some doubt as

to whether the direction was sufficient to impose this duty on the defendants, which I shall not stop to consider, as the objection raised may be otherwise disposed of.

The exact time of the arrival of the forty-four boxes being a matter peculiarly within the knowledge of the defendants, very slight evidence on the part of the plaintiff, in respect to the time of their arrival, was sufficient to throw the onus upon the defendants of showing when they arrived. One of the consignees having testified that he received them on the 8th and 9th of May, I think the justice was warranted in concluding that they had arrived about that time. This witness' testimony was taken *de bene esse*, and reduced to writing. In one part of it, he uses the word "received" on the 17th and 21st of May, as applied to the 100 boxes, and, when asked again when they were *received*, he answers they *arrived* on the 17th and 21st of May. This was evidence, in respect to that lot, that he received them on the respective days of their arrival. It was therefore some evidence to warrant the inference that the same thing took place in respect to the other lot—that is, that they arrived on the 8th and 9th of May, the days when the witness received them ; or, if not, the testimony of the witness is susceptible of this interpretation, from the manner in which he uses the word, that he meant, by "*received*," "*arrived*." In either way, it was sufficient, in my judgment, to require at the hands of the defendants proof if the fact was otherwise, as they had knowledge, through their agents, of the exact time of the arrival; and as the witness was examined *de bene esse* more than twenty days before the trial, they cannot claim to have been taken by surprise. Proof by the consignee, also, that he received but forty-four boxes, was, for the same reason, sufficient *prima facie* that the remaining six boxes had not been delivered; sufficient at least to require from the defendants proof that they had been delivered, if such was the fact. For the six boxes, then, the defendants were liable.

Regarding the evidence of the time of the arrival of the other boxes as sufficient, it was incumbent upon the defendants to account satisfactorily for their delay in not delivering them within

the contract time ; for, if the goods were deteriorated or injured in consequence of that delay, the plaintiff was entitled to be compensated for the damage sustained.    It is urged that, as the boxes contained fruit, which, by the agreement, was to be "at the owner's risk of fracture or injury" during the course of transportation, or of loading, or unloading ; and, as the defendants were not to be liable for the natural tendency of any article to decay, they were not responsible for the rotten and damaged condition in which the oranges and lemons were when they were delivered at Milwaukee.    This must be understood, however, as applying to decay or injury to which the fruit might be subject during the prescribed time within which the defendants undertook to deliver it at Milwaukee.    It was a perishable article, and it would be absurd to say that, if it perished by reason of the defendants' neglect to perform their contract, they would not, in consequence of this stipulation, be answerable for the loss.    It was in evidence that the oranges and lemons were in good order at the time of shipment, and that, with the weather that prevailed in the months of April and May, 1856, oranges would keep for 25 days, and that then they would decay very rapidly.    If kept or delayed, then, upon their carriage, much over that time, their decay and total loss was inevitable ; and it would be doing the greatest violence to language to suppose that, under an agreement to transport them in twelve days, the parties meant, by "injuries in the course of transportation," or "natural tendency to decay," injuries or decay after that time, arising from the defendants' neglect to transport and deliver them.    In other words, that the defendants might, with impunity, neglect to perform their contract until, from the perishable nature of the property, it became entirely worthless.    It is not to be supposed that any public carrier would deliberately put forth such a reservation in favor of his own negligence ; or, if he did, that any owner of property would agree that it might be transported upon such terms.    Even if no time had been agreed upon, the defendants would have been bound to have completed their contract within a reasonable time, and, if they had failed to do it within that time without legal

excuse, and the property afterwards, and before delivery, had become injured from its natural tendency to decay, they would have had to make good the loss. The transportation contemplated by such agreements, is a transportation within the time prescribed, or within a reasonable time, during which period, including the period of loading and unloading, the enumerated articles are at the owner's risk of fracture or injury ; and, as respects all other property, the defendants, within that period, are not liable for injuries occasioned by the weather, natural tendency to decay, or accidental delays.

It is further urged that the agreement of the defendants to pay five cents per 100 pounds per day for each day the goods might be delayed beyond contract time, is the extent of their liability for any damage or injury to the property. But this is an agreement to pay a certain sum for each day's delay in the delivery, and is recoverable where the defendants deliver the goods after the contract time, though in as perfect a state as they received them. It is not an agreement to pay for loss or damage, but is recoverable whether loss or damage is sustained or not. The owner may actually sustain no loss. The goods may have largely increased in value at the time of their actual delivery, and yet this sum, which the defendants contracted to pay in a certain contingency founded upon the consideration of the payment to them of the stipulated freight, would be due and payable. Suppose the goods to have been lost through the defendants' negligence, in that they were unable to make any delivery at all ; is this per diem allowance to be a perpetual charge upon the defendants? What construction would be given to this provision in such a case. Would it be regarded as the mode or rate at which the plaintiff was to be compensated for his loss and damage? Clearly not; but as applicable only to cases where the property was delivered uninjured, but after the contract time. This, in my judgment, would be the fair and legal interpretation of it.

The plaintiff having shown that there was a delay of nine days in delivering the forty-four boxes of the first lot; that the re-

Place v. Union Express Co.

maining six boxes of that lot had not been delivered; that there was a delay of sixteen days in the delivery of the second lot; that some of the boxes were broken, and the fruit had run out; together with the market value of the goods at Milwaukee at the time when they were to be delivered, and the extent to which they had depreciated in value from rot or decay when they were delivered; had, in my judgment, established a case which entitled him to recover. The evidence was sufficient to warrant the justice in concluding that the decay and injury of the fruit was the result of the delay in its delivery. It is insisted that as, by the agreement, all claims for damages were to be presented at the New York office for settlement, it was incumbent upon the plaintiff, as a condition precedent to the defendants' liability, to show that he presented his claim for settlement at that office, and that, without proof of that fact, he could not maintain this suit. This reservation, however, is no stronger than that contained in a promissory note which the maker promises to pay upon demand; in respect to which it has been held that the commencement of the suit is a sufficient demand; or which the maker promises to pay on a particular day at a particular place, in which it is not necessary to aver or prove, to charge him, that a demand was made at the time and place. His readiness to pay at the time and place, or at the commencement of the suit, is matter of defence which goes only to the question of interest and costs, and not to the cause of action, of which he must avail himself by pleading the fact specially, and bringing the money into court. *Haxtun* v. *Bishop*, 3 Wend. 21; *Walcot* v. *Van Santvord*, 17 John. 248; *Green* v. *Goings*, 7 Barb. 652. The defendant's answer here was a general denial, and it does not appear that he made any tender in the court below of the amount which the plaintiff recovered, or admitted that he was liable at all for any amount.

The remaining question in this case, is whether the evidence offered by the defendants established, in the language of their agreement, that the delay was accidental, or the result of unavoidable or extraordinary casualty. They proved that they sent the goods by the N. Y. Central Railroad, the Suspension Bridge,

and the Great Western Railroad, through Canada, and that they had no arrangement with any other road. That in March, April and May, 1856, the Great Western road was not able to take freight as fast as the New York Central could deliver it. That the Great Western road was building a new freight-house on the Canada side, and that there was some disarrangement of the road. That that road was at least ten days behind, upon an average. That in those months there was a great accumulation of freight at the bridge. Some freight lay there ten or fifteen days. That the cause was a snow storm, the building of the freight-house on the Canada side, and the disarrangement of the Great Western road. That they could have sent the freight by another route, the New York and Erie Railroad, but they had no arrangements with that route. Even if this evidence was sufficiently specific and certain to show that the delay in the delivery of these particular goods, proceeded from the causes above stated, it did not show that it was the result of accidents or casualties beyond the defendants' control. Engaged, as the defendants were, in the transportation of goods as a business, it was their duty to know the condition and possibilities of transport afforded by the routes which they selected before entering into an express contract to transport goods within a stipulated number of days, especially as the causes which they now set up as their excuse, were not of sudden development or temporary duration, but extended over a period of three months. The chief causes, the disarrangement and want of facilities on the Great Western road, they knew, or should have known. One of the members of their company was at the Suspension Bridge in March, to attend to the getting of the freight through for the company. In the latter part of March there was a large accumulation of freight at the bridge, and while he was there, there was a snow storm that stopped the cars on the Central side. He was there again between the 18th and 23d of April, some days before the last of the two lots were shipped, and the Great Western Railroad Company having built a new depot for the transfer of freight, they had not got their tracks laid, and, instead of sending on 100 cars a day, as they anticipated, they

could only send 30 or 40. All this, it would seem, was known to the defendants, or to the member of their company whose business it was to attend to getting the freight through, and who, by his own statement, knew the capacity of the roads which the defendants made use of for carrying freight in April and May. The route being thus obstructed, the defendants ought not to have made such contracts, or, making them, they should have sent the goods by another route. Their witness testified that the fruit could have been sent by the New York and Erie Railroad. It is suggested that that road may have been obstructed also. If it was, it was for them to show it; for them to make out that the delay was unavoidable—the result of causes beyond their control. With a knowledge on the part of a member of their company that the route was obstructed in March, that there was a large accumulation of freight at the Suspension Bridge in the latter part of March, they saw fit, on the 9th of April, to enter into a contract to deliver at Milwaukee in twelve days, which, with culpable ignorance or actual knowledge, they undertook to execute by sending the goods by a route, the condition of which, according to the showing of their defence, was such that they could not be transported within that time. They either contracted to do what they knew to be impossible, or, being possible, neglected to avail themselves of a route by which, according to their own witness, the goods might have been sent. If there was any difficulty or obstruction upon that route, it was for them to prove it. They did the same thing again, and under the same state of things, on the 26th of April, and all that need be said is that they must answer for the consequences.

Where there is an express contract to carry within a *prescribed* time, the carrier is held to a rigid performance of it, and is not excused even by inevitable necessity, unless he has provided against it by express stipulation. Angell on Carriers, § 294. On such a contract, no cause of delay can be pleaded except it has been distinctly reserved and named in the contract. The causes provided against in the contract are accidents or casualties beyond the defendants' control; or, as it is expressed in another

part of the writing, cases of unavoidable or extraordinary casu‑ alty. They did not establish that the delay was beyond their control, or the result of unavoidable casualty. For all that ap‑ peared, it was, or may have been, in their power to have trans‑ ported the goods within the twelve days.

Judgment affirmed.